**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRENDA WHORTON,                          .
                                         .
                    Plaintiff,           .
                                         .      Civil Action No.: 1:11-cv-01291-RC
          v.                             .
                                         .
WASHINGTON METROPOLITAN                  .
AREA TRANSIT AUTHORITY *et al.*,         .      Re Document No.:  17
                                         .
                                         .
                    Defendants.          .


**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

**I.  INTRODUCTION**

Plaintiff, Brenda Whorton, a former employee of the Washington Metropolitan Area

Transit Authority ("WMATA"), claims that she was denied training, promotion/selection, and

other opportunities, and was subjected to sexual harassment and a hostile work environment,

based on her race (white), gender (female), and in retaliation for complaining about her

discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e, *et seq*. ("Title VII").[1]  WMATA has filed a motion for summary judgment largely arguing

that plaintiff's Title VII claims are untimely because she failed to file a "charge" with the Equal

Employment Opportunity Commission ("EEOC") within 180 days of the alleged discriminatory

acts; and, she has not raised claims rising to the level of a hostile work environment.  [Docket

No. 17].  For the reasons set forth below, because most of plaintiff's claims are timely and she

---

[1]      Plaintiff's Complaint also raised a failure to accommodate claim pursuant to the
Americans with Disabilities Act.  *See* Complaint [Docket No. 1], Count IV.  But plaintiff
subsequently voluntarily withdrew this claim. [Docket No.  3].

has adequately asserted claims of hostile work environment based on gender and retaliation, the defendant's motion for summary judgment is GRANTED IN PART, and DENIED IN PART.

## II.  FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Plaintiff has raised a number of claims concerning alleged discrimination.  The timing of such claims, whether they can be considered discrete acts of discrimination or part of a hostile work environment, and whether such claims were raised with the EEOC, are critical to assessing defendant's dispositive motion.  As such, the Court endeavors to lay out the claims as precisely as the existing record allows and place them in the proper context.

Plaintiff claims that she was denied MAXIMO training.  Plaintiff raised this issue in the EEOC Questionnaire she submitted in June of 2007[2] as well as in the EEOC Charge dated February 2008.  Def's Exh. B & Pltf's Exh. 3.  Plaintiff has testified that her request for such training occurred in late 2005 or early 2006.  Whorton Depo. at 44.  And because the individuals that allegedly received the training were women, this claim appears to apply only to a race claim.  *See, e.g.*, Pltf's Exh. D (Ms. Pate received formal MAXIMO training); Plaintiff's Statement of Material Facts ("Pltf's SMF") at ¶¶15-16 (co-workers Pate and Reynolds, both black females, received MAXIMO training).

Plaintiff also raises a claim that, while working on some equipment, she received a shock that was purposely planned by her co-workers as part of a "prank."  This event is alleged to have occurred in March 2006.  *See* Pltf's Exh. J, Interrogatory Responses at p. 13.  Plaintiff's EEOC Questionnaire does not refer to this incident but her EEOC Charge may vaguely refer to it.  Def's Exh. 3 ("including being placed in dangerous situations by co-workers").  The record does not

---

[2]      There is some question as to whether plaintiff can properly authenticate this document.  *See* Whorton Depo. at 116-18.  But WMATA has not squarely challenged its admission, so the Court does not address the issue.

reflect why plaintiff believes this incident was related to her race or gender.[3]

Plaintiff further claims that in November 2006 she was denied rail car training and the opportunity to work on the rehabilitation wiring of a train. Pltf's Interrog. Response at 9. She was allegedly told that this was because of her gender. *Id.* This claim does not appear to have been included in either the EEOC Questionnaire or EEOC Charge.

Plaintiff also alleges that, on December 7, 2006, sexually offensive material was placed under her toolbox. Pltf's Interrog. Responses at 10. This claim was not included in the EEOC Questionnaire or the EEOC Charge.

On or about December 17, 2006, plaintiff filed an internal complaint with WMATA's Office of Civil Rights. *See* WMATA MSJ at 14. The record does not reflect what claims were included. There is no documentation in the record concerning her internal complaints. However, because WMATA concedes that this internal complaint was filed on this date, the Court will regard it as the first instance in which plaintiff engaged in activities protected by Title VII. Thus, the alleged actions set forth above could not have been motivated by retaliation.

Between October 2006 and May 2007, plaintiff alleges that she applied for approximately five clerical positions. EEOC Questionnaire; Whorton Depo. at 85. These non-selections were specifically mentioned in plaintiff's EEOC Questionnaire and vaguely mentioned in the EEOC Charge ("I have been denied promotion/selection . . . and other opportunities."). But the record does not reflect specific dates for these alleged discrete non-selections, the specific positions

---

[3]     Plaintiff has referred to an incident in which she was allegedly trapped inside a paint booth containing hazardous fumes for a "brief period." Interrog. Response at 13-14. But no information is in the record concerning when this occurred, who was involved, or why it is alleged to have been related to plaintiff's race or gender. Similarly, plaintiff has alluded to having received an unfair PAR around August 2006 but little more is revealed concerning this claim. Accordingly, the Court does not address these allegations further.

applied for, nor does it reflect the race or gender of the individuals who received the positions. Without this information, it is impossible for the Court to determine whether these non-selections were challenged in a timely fashion, whether plaintiff has alleged a *prima facie* case of discrimination or retaliation, who the deciding selection officials were, or whether there is any evidence of discrimination or retaliation for these claims.

Around this same period, plaintiff also alleges that she was not allowed to work in administrative positions while her co-workers were placed in such positions non-competitively.[4] The plaintiff mentioned this specifically in her EEOC Questionnaire and, as set forth above with respect to the clerical positions, vaguely in her EEOC charge. The record does not reflect when these non-competitive selections were made. Thus, the Court cannot determine whether these claims are timely. Moreover, because the non-competitive administrative duties were given to three women (*see* EEOC Questionnaire referring to three black females: Park, Reynolds, Bryant), this claim would only involve race claims.

Plaintiff further alleges that, around 2007 or 2008, Art Canales left her a nasty note complaining that she should not leave anything on his workbench. Whorton Depo. at 98-101. This claim was not included in the EEOC Questionnaire or the EEOC Charge, but was included in plaintiff's counsel's letter to the EEOC in response to WMATA's denials of discriminatory behavior. Pltf's Exh. D at 3 ("Ms. Whorton has also received offensive and disrespectful notes from co-workers with messages such as 'NEVER, EVER TOUCH MY DESK AGAIN!'"). Plaintiff felt that this note was related to her gender because he would not have left such a note for a man. Whorton Depo. at 99. But this was an isolated incident involving Mr. Canales; he

---

[4]     The record is not clear whether these non-competitive administrative assignments are the same as the five clerical positions for which plaintiff was not selected. In an abundance of caution, the Court treats them as separate claims.

4

and plaintiff worked different shifts and, thus, did not otherwise interact in the same work environment.  *Id.* at 100-101.

Additionally, plaintiff claims that a supervisor put her psychiatric information in a file. The date of this alleged act is unclear but may be January 2007.[5]  This incident *may* be vaguely referred to in plaintiff's EEOC Questionnaire ("I been violated by document") and does not appear in the EEOC Charge.  Moreover, this alleged act does not appear to be related to plaintiff's gender or race, but could plausibly be part of a retaliation claim.

On June 14, 2007, plaintiff filed a second internal complaint with WMATA's Office of Civil Rights.  *See* WMATA MSJ at 14.  Again, the record does not reflect its contents.

A few days later, on or about June 24, 2007, plaintiff submitted her Intake Questionnaire to the EEOC.  Pltf's Exh. B; Whorton Depo. at 114-115.  In the Questionnaire, plaintiff asserted that discrimination/retaliation had occurred between January 2006 and June 2007.  *Id.*  It specifically included allegations concerning: clerical duties; MAXIMO training; administrative duties non-competitively assigned; being moved from Brentwood to Greenbelt; violation by a document; and, an inappropriate letter sent by her supervisor, Thompson, to the absenteeism department.  *Id.*  The format and wording of this document ("Organization against which charge is being filed;" "Other employer/organization - you want to include in the filing of this charge."), indicates that the individual submitting it to the EEOC intends to file a charge.  But, even if this document is treated as the appropriate EEOC "charge," because it was submitted on or about June 24, 2007, any discrete acts of discrimination occurring before, on or about, December 24, 2006, would be untimely.  Thus, as set forth below, to the extent they are considered discrete

---

[5]      WMATA refers to this act being alleged to have occurred on January 16, 2007. WMATA's MSJ at 7.  But the record does not seem to contain when plaintiff alleges this event occurred.

acts, the claims involving the MAXIMO training denial, the electrical shock "prank," the denial

of railcar training, etc., would be untimely.

On or about June 19, 2007, plaintiff asserts that her treating psychiatrist, Altaf Merchant,

M.D., recommended that plaintiff be transferred to another department because her work

environment exacerbates her depression and anxiety.  Pltf's Exh. L.  From June 2007 to

December 2008, plaintiff alleges that she was given schematics that were not in compliance with

engineering code.  Pltf's Interrog. Responses at 11.  This allegation does not appear in the EEOC

Questionnaire, probably because the acts allegedly took place after it was submitted to the

EEOC.  But it does not appear in the EEOC Charge either.

On December 12, 2007 and at other points while plaintiff was assigned to WMATA's

Greenbelt facility, plaintiff alleges that her male co-workers displayed sexually explicit materials

on their workbenches in plaintiff's line of sight.  Pltf's Interrog. Responses at 10-11.  The

sexually explicit materials included: Warren Thomas displaying a black and white nude photo of

a woman, and other co-workers displaying pictures of wives and girlfriends in seductive poses.

*Id.*  Plaintiff further alleges that, when she asked for these materials to be removed, she was

retaliated against: her work bench was disturbed, her tool box was damaged, tools went missing,

and rumors circulated that she was a "trouble maker."  *Id.*  Although plaintiff's EEOC charge

refers generally to a continuous pattern of harassment and specifically to sexual harassment

based on her gender, it does not describe the above-referenced incidents.  Def's Exh. 3.

On or about February 20, 2008, plaintiff submitted to the EEOC the Charge of

Discrimination form.  *Id.*  In it, plaintiff specifically alleges discrimination from December 7,

2006[6] to October 1, 2007, but also describes it as a "continuing action."  *Id.*  In the EEOC

Charge, plaintiff claims that she has "been subject to a continuous pattern of discrimination,

harassment and retaliation."  *Id.*  Furthermore, she specifically alleges sexual harassment based

on her gender.  *Id.*  Moreover, she alleges that she has been retaliated against with regard to

assignments, *terms/conditions, and harassment*, based on filing an internal complaint of

discrimination.  *Id.* (emphasis added).  The charge describes in specific terms very few of the

events described above.  But it does refer generally to: being placed in dangerous situations by

co-workers and management (a likely reference to the shock "prank"); denial of

promotion/selection, transfers and other opportunities (a likely reference to the denial of clerical

positions and assignment of administrative duties); denial of training (a likely reference to the

denial of MAXIMO training).  Plaintiff's various documents, *e.g.*, EEOC Charge, Counsel's

Response Letter, Counsel's Amendment Letter, and Amended Charge, do not explicitly make

any allegations of discriminatory/retaliatory acts having occurred in 2008.[7]

On February 26, 2008, plaintiff's treating psychiatrist, Altaf Merchant, M.D., again

recommended that plaintiff be transferred to another department because her work environment

exacerbates her depression and anxiety.  Pltf's Exh. L.  He also stated that his previous

recommendation had been ignored.  *Id.*

Sometime in 2009, plaintiff claims that her supervisor, who apparently was looking for her

while she was on vacation, telephoned her ex-husband who was still listed as her emergency

contact and told him that plaintiff was absent without leave.  Whorton Depo. at 55-56.  This

---

[6]      The EEOC Questionnaire alleged that the discrimination had started January 2006.  Pltf's
Exh. B.

[7]      But plaintiff's Interrogatory Responses refer to plaintiff having been given schematics
that were not in compliance with engineering code throughout 2008.  Pltf's Interrog. Responses
at 11.

claim appears only possibly indirectly in her Counsel's Response Letter in February 2009 ("It is unlikely that a concerned supervisor would attempt to contact an employee to confirm that they are not AWOL, as Ms. Whorton was on vacation and this time off is requested in advance."), but does not appear in her Amended Charge of July 2010.  Pltf's Exhs. D & E.

Apparently, WMATA submitted to the EEOC a response to plaintiff's claims generally denying discrimination that was provided to plaintiff's counsel on or around January 7, 2009. Pltf's Exh. D at 1.  On February 9, 2009, plaintiff's counsel prepared a rebuttal to WMATA's response.  *Id.*  In Counsel's Response Letter, he explicitly discusses: denial of MAXIMO training; non-selection for the five clerical positions; the alleged constant harassment from her peers which includes tampered and stolen tools, the purposeful disorganizing of her workspace, and the receipt of an offensive note ("NEVER, EVER TOUCH MY DESK AGAIN!"); and, the shock "prank."

On or about June 2009, plaintiff claims that her fill-in supervisor, Dwayne Davis, received an e-mail complaining about her paperwork and he stood up in a meeting and said to her in front of her co-workers "Chris Stallings said you F'ed this up."  Whorton Depo. at 101-02. When plaintiff complained to him about the exchange, he allegedly told her to toughen up.  *Id.* This incident is not included in plaintiff's Amended Charge of July 2010.  Pltf's Exh. E.  July 8, 2009 was the last day plaintiff was physically present at work for WMATA.  Whorton Depo. at 102.

As a result of a disagreement with a co-worker at this point (the record does not reflect whether this disagreement is the same one concerning Mr. Davis), WMATA required plaintiff to submit to an independent medical examination ("IME").  Pltf's Exh. E.  WMATA has described plaintiff's behavior spurring the IME as "irrational, aggressive and confrontational."  Pltf's Exh.

8

M.  A WMATA physician, Dr. Pervall, concluded as a result of the IME that plaintiff was fit to perform her duties as an electrician, however, it was recommended against her returning to the Greenbelt Division, *i.e.*, a physician within WMATA itself concluded that plaintiff was physically capable of doing her job but should not be returned to the same work environment. *Id.*

In September 2009, an e-mail exchange took place between one of plaintiff's supervisors, Gene Garzone, and personnel from WMATA's Medical Services and Compliance Branch.  Pltf's Exh. N at 8-20.  The exchange was initiated when Mr. Garzone received a copy of Dr. Pervall's conclusion that plaintiff was fit for duty, but should not return to Greenbelt.  *Id.*  In Mr. Garzone's response, he expresses irritation that Dr. Pervall had informed plaintiff of the recommendation and had not consulted with his office.  *Id.*  He asserts that the IME was requested due to erratic and disruptive behavior over the previous two years, which he stated included arguably protected activity including plaintiff contacting the WMATA Office of the General Manager, Inspector General and the Office of Safety, and making threats not in the best interests of WMATA.  *Id.*  In the exchange, Mr. Garzone could reasonably be interpreted as exhibiting hostility to plaintiff's return to the workplace and he claims that any issue involving plaintiff's move to another work environment is strictly a union issue.  *Id.*  In conclusion of his first e-mail, Mr. Garzone reiterates that plaintiff remains subject to a pending disciplinary action because of her erratic behavior that could result in her termination.  *Id.*

In response to Mr. Garzone's e-mail, personnel from WMATA's Medical Services and Compliance Branch reiterate their position that "it would be in the best interest of the organization [that plaintiff] be placed in another location" and that "it would be in the best interest of the organization for the employee's management to re-assign [plaintiff] to a new

division as well as new management." *Id.*  They further conclude that, if plaintiff is left in the

"current situation," "it is definite, [plaintiff] will continue to have significant problems that are

disruptive to the workplace as well as the flow of business." *Id.*  Mr. Garzone took this

exchange to mean that plaintiff could not return to a safety-sensitive position and, thus, could not

return to his organization. *Id.*  But Medical Services quickly corrected him by saying that

plaintiff was fully capable of performing her duties as assigned, and that she simply should not

be returned to the "volatile situation precipitated by the 'practical joke that resulted in [plaintiff]

getting electrocuted.'"  Medical Services concluded that, based on that "joke," plaintiff had a

"valid reason not to feel safe" in her prior work environment and ended the communication by

telling management it had two choices: 1) follow medical's recommendation to move plaintiff to

another work environment with new management, or 2) return her to her prior job (which will

result in continued disruption). *Id.*  In response, Mr. Garzone sought the intervention of

WMATA's Human Resources department exhibiting resistance to taking plaintiff back. *Id.*

Apparently, in November 2009, WMATA informed plaintiff that she was released by

WMATA's Medical Services and Compliance Branch to resume normal duties.  Pltf's Exh. E at

2.  Plaintiff claims that her psychiatrist, Dr. Sussal, concluded she was medically unable to

resume her responsibilities so long as she was still subjected to the same working environment.

*Id.*  Consequently, the plaintiff submitted supporting documentation to WMATA's Medical

Office. *Id.*  This communication is not in the record.  Also during this time period, apparently,

plaintiff sought reasonable accommodations pursuant to the ADA. *Id.*  But due to an

administrative error, plaintiff claims she did not receive notice of an ADA panel meeting to

assess her request for accommodation. *Id.*  Plaintiff asserts that, through counsel, she attempted

to schedule another panel, but her request for accommodation was dismissed. *Id.*

10

On March 2, 2010, plaintiff resigned her position effective March 16, 2010.  Def's Exh. 6.  Plaintiff claims that WMATA's failure to grant her an accommodation and refusal to allow her to work in another environment left her no reasonable option but to resign.  Pltf's Exh. E at 3.  Hence, plaintiff claims that this treatment, culminating with her constructive discharge, was retaliation for her prior complaints to the Office of Human Rights and EEOC.  *Id.*

On July 21, 2010, plaintiff's counsel wrote to the EEOC requesting that plaintiff's EEOC charge be amended.  Pltf's Exh. E.  Although, as WMATA contends, the majority of that request was made to add a failure to accommodate claim pursuant to the ADA, a claim that plaintiff has since abandoned, it includes more.  Specifically, that letter also asserts retaliation in violation of Title VII and claims that the alleged hostile treatment plaintiff received in response to her requests to be moved to another work environment, culminating in her constructive discharge, was retaliation for her prior complaints of discrimination and retaliation.  *Id.*

That request resulted in an amended charge of discrimination dated February 18, 2011.  Pltf's Exh. F.  In that amended charge, plaintiff complained of discrimination and retaliation from December 7, 2006 (the same date as in her original EEOC Charge) to March 16, 2010 (the effective date of her resignation).  In that amended charge, plaintiff again complained of a continuous pattern of discrimination, harassment and retaliation and of being subjected to sexual harassment based on her gender.  *Id.*  Moreover, she alleged that she believes she had "been retaliated against for engaging in protected activity with regard to assignment, *terms/conditions, harassment*, reasonable accommodation, and constructive discharge in violation of Title VII."  *Id.*

## III.   ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; Fed. R. Civ. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials").  In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex*, 477 U.S. at 324.  On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**B.   Timeliness of Plaintiff's Hostile Work Environment and Discrimination Claims**

Although plaintiff's Complaint (and her administrative submissions) do not break down claims neatly between discrete claims of discrimination and hostile work environment claims, WMATA's untimeliness arguments and the Supreme Court's opinion in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), require that the Court assess each type of claim separately. That is because, in its simplest terms, *Morgan* requires that a plaintiff file a charge with the EEOC for each separate discrete act of discrimination within the required period of time. In the case of claims against WMATA, a claimant must file a charge with the EEOC within 180 days of the discriminatory act. *See generally* Statement of Interest by the United States of America. [Docket No. 25][8] But with respect to claims of hostile work environment, which are different in kind because they involve repeated conduct that does not fully manifest itself on any particular day, a claim is timely so long as one of the acts contributing to the hostile work environment occurred within the 180-day filing period. *Morgan*, 536 U.S. at 116-17. Accordingly, with these concepts in mind, the Court assesses the timeliness of plaintiff's claims.

---

[8]    Although the relevant EEOC statute, 42 U.S.C. § 2000e-5, generally requires a claimant to file an EEOC charge within 180 days of the allegedly discriminatory act, it allows a charge to be filed within 300 days if the claimant has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice. 42 U.S.C. § 2000e-5(c); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002) (citing *Zipes v. Trans World Airline, Inc.*, 455 U.S. 385 (1982)); *Dezaio v. Port Auth. Of New york & New Jersey*, 205 F.3d 62, 64 (2d Cir. 2000). But, because WMATA is part of an interstate compact agency, the compact jurisdictions have conferred their sovereign immunity upon it. *See, e.g., Jones v. WMATA*, 205 F.3d 428, 432 (D.C. Cir. 2000). Thus, because WMATA is not subject to the state or local anti-discrimination laws, the local authority (in this case the Prince George's County Human Rights Commission) was without authority to grant or seek relief for the plaintiff. Consequently, the 300 day provision is inapplicable and the 180 day provision controls.

## 1.    Discrete Acts of Discrimination

Although the thrust of plaintiff's Opposition to WMATA's Motion for Summary

Judgment is that her claims are timely because she is alleging a hostile work environment, she

appears to continue to allege discrete claims of discrimination concerning the denial of

MAXIMO training and the assignment of administrative work to her colleagues but not to her.

Opposition at 7-8.  In an abundance of caution, the Court assesses whether such discrete claims

are viable.

The EEOC has broad authority to enforce Title VII's mandates, and the EEOC has

established detailed procedures for the administrative resolution of discrimination complaints.

*Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  "Complainants must timely

exhaust these administrative remedies before bringing their claims to court."  *Id.*  In particular,

Title VII requires that plaintiffs file an EEOC charge within a certain time period of the allegedly

unlawful act.  42 U.S.C. § 2000e-5(e)(1).  Specifically, the statute states:

> (e) Time for filing charges; time for service of notice of charge on respondent; filing of
> charge by Commission with State or local agency; seniority system
>
> (1) A charge under this section shall be filed within one hundred and eighty days after the
> alleged unlawful employment practice occurred and notice of the charge (including the
> date, place and circumstances of the alleged unlawful employment practice) shall be
> served upon the person against whom such charge is made within ten days thereafter,
> except that in a case of an unlawful employment practice with respect to which the
> person aggrieved has initially instituted proceedings with a State or local agency with
> authority to grant or seek relief from such practice or to institute criminal proceedings
> with respect thereto upon receiving notice thereof, such charge shall be filed by or on
> behalf of the person aggrieved within three hundred days after the alleged unlawful
> employment practice occurred, or within thirty days after receiving notice that the State
> or local agency has terminated the proceedings under the State or local law, whichever is
> earlier, and a copy of such charge shall be filed by the Commission with the State or local
> agency.

42 U.S.C. § 2000e-5(e).  As set forth above, plaintiff had to submit a charge with the EEOC

within 180 days of the alleged discriminatory acts.

The Supreme Court has stated that a "charge" can be an informal document so long as an objective observer would conclude that the filer requests that the agency activate its machinery and remedial processes. *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 402-03 (2008). Under this guidance, courts have concluded that letters and EEOC Questionnaires can qualify as charges. *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 6-8 (D.D.C. 2011) (letter from filer's counsel accompanied by EEOC questionnaire qualify as charge); *see also Edelman v. Lynchburg College*, 535 U.S. 106 (2002) (letter from filers can qualify as charge in remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process).[9]  The Court concludes that the EEOC Questionnaire submitted by plaintiff on June 24, 2007, constitutes a charge because plaintiff requested that the EEOC activate its machinery and remedial processes.  Thus, any discrete acts of discrimination occurring before, on or about, December 24, 2006 (180 days previous), would be untimely.

The denial of plaintiff's request for MAXIMO training occurred in late 2005 or early 2006.  Whorton Depo. at 44.  Accordingly, discrete claims based on the denial of such training are untimely.[10]

---

[9]     Although the D.C. Circuit in *Park v. Howard Univ.*, 71 F.3d 904, 908-09 (D.C. Cir. 1995) declined to rely on a pre-complaint questionnaire in assessing the scope of a charge, in that case the questionnaire contained language making it clear it was not considered a charge and there was no evidence that either the defendant or the EEOC ever had access to it.  Here, there is no qualifying language in the questionnaire and it is not disputed that the EEOC had access to it. To the contrary, as set forth above, the language in plaintiff's EEOC Questionnaire makes clear that plaintiff intended that the EEOC activate its machinery and remedial processes.

[10]    Additionally, even if such claims were timely, they would fail because denial of such training would not constitute an actionable adverse employment action.  The mere denial of training opportunities does not constitute an adverse employment action and is, thus, not actionable unless there is a resultant "material change in . . . employment conditions, status, or benefits."  *Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (denial of the plaintiff's

With respect to the denials of requests for administrative assignments, the record is less clear.  Plaintiff has alleged that she applied for five clerical positions between October 2006 and May 2007.  EEOC Questionnaire; Whorton Depo. at 85.  No evidence of these applications exists in the record.  Based on these unsupported allegations themselves, some of the claims are untimely because the non-selections would have occurred before December 24, 2006.  But there is no proof in the record that any of these non-selections occurred, much less that claims based upon them are timely.[11]  Accordingly, the Court cannot conclude that any discrete claims of discrimination based on non-selections for clerical positions or the assignment of administrative duties are timely.

## 2.   Hostile Work Environment

As set forth above, under *Morgan*, assessing whether a claim is timely is different for

---

request to attend four training courses was not an adverse employment action); *Lester v. Natsios*, 290 F. Supp. 2d 11, 29 (D.D.C. 2003).  While the "denial of training may rise to the level of an adverse employment action," *Freedman v. MCI Telecomm'ns Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001), the denial must "result[ ] in a tangible harm," *Everson v. Medlantic Healthcare Group*, 414 F. Supp. 2d 77, 84 (D.D.C. 2006); *Edwards v. EPA*, 456 F. Supp. 2d 72, 86 (D.D.C. 2006) ("[T]o be adverse, the denial of a travel or training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment."). Although plaintiff has pointed to no tangible harm from the denial of training, she has generally alleged that such training would have been career enhancing.  Without more, such a claim is speculative.  In fact, there is some evidence in the record that MAXIMO training would have been helpful to qualify her for administrative duties that paid *less* than she was making.  *See* Def.'s Exh. 5 (Grievance Opinion stating that the grievant acknowledged that the Rail Maintenance Clerk position is a lower paid position than her Mechanic position).

[11]     To the extent that plaintiff refers to assignment of administrative duties within her office rather than applications for separate clerical positions within WMATA, there is no evidence in the record that others were given such duties, or such duties were available to be assigned to plaintiff, within six months of the EEOC Charge.  Moreover, there is no indication in the record that the denial of such a duty assignment involving no additional pay would constitute an actionable adverse employment action simply because plaintiff preferred those duties.  *See, e.g., Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (a plaintiff who is denied a lateral transfer, one in which she suffers no diminution in pay or benefits, does not suffer an actionable injury unless there are some other materially adverse consequences; mere idiosyncrasies of personal preference are not sufficient to state an injury).

hostile work environment claims.  The plaintiff's hostile work environment allegations raise a number of preliminary questions.  First, given that none of plaintiff's EEOC submissions refer to a hostile work environment claim, did plaintiff administratively exhaust such a hostile work environment claim?  Second, to the extent that such a claim was administratively exhausted, what is the scope of such a claim or claims?  Third, given such a scope of claim or claims, were they timely raised?  Finally, are the alleged acts supporting the timely claims sufficiently severe or pervasive to rise to the level of an actionable hostile work environment claim?  The Court addresses each question below.

### C.   Plaintiff's Hostile Work Environment Claims

### 1.   Have the Hostile Work Environment Claims Been Exhausted?

As set forth above, none of the plaintiff's administrative submissions specifically refer to a hostile work environment claim.  So the Court must preliminarily determine what submissions are appropriately considered and, based on those submissions, whether a hostile work environment claim can be inferred to have been raised.  For the reasons set forth below, the Court believes that such claims can, in fact, be inferred.

In determining whether a hostile work environment claim has been exhausted, the D.C. Circuit has said that a "Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'"  *Park*, 71 F.3d at 907, quoting *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).  "At a minimum, the Title VII claims must arise from 'the administrative investigation that can [be] reasonably expected to follow the charge of discrimination.'"  *Id.* quoting *Chisholm v. Postal Service*, 665 F.2d 482, 491 (4th Cir. 1981).  In determining what claims have been exhausted based on the scope of the investigation that would

reasonably ensue, courts in this district have looked at informal intake questionnaires, *Johnson-Parks v. D.C. Chartered Health Plan*, 806 F. Supp. 2d 267, 271 (D.D.C. 2011), and parties' letters to the EEOC discussing the substance of the claims, *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 14 (D.D.C. 2011).

WMATA makes two arguments as to why plaintiff did not exhaust a hostile work environment claim. *See* WMATA's Supplemental Brief [Docket No. 23] at 3. First, WMATA argues that the EEOC Charge does not include the words "hostile work environment." But a plaintiff need not use any magic words in a charge much less use the specific term "hostile work environment" in order to properly exhaust such a claim. *Johnson-Parks*, 806 F. Supp. 2d at 270 quoting *Maryland v. Sodexho, Inc.*, 474 F. Supp. 2d 160, 162 (D.D.C. 2007) ("[T]he law does not hold an employee to the use of magic words to make out a proper discrimination charge."); *Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C. 2008) (a "plaintiff need not specifically allege a hostile work environment claim" at the administrative level). Second, WMATA argues that plaintiff failed to exhaust a hostile work environment claim because her EEOC Charge stated that the discrimination ended on October 1, 2007, and some of plaintiff's allegations supporting a hostile work environment claim post-date that date. But, plaintiff's EEOC Charge also specifically claimed that the discrimination was ongoing as a continuing action. Def's Exh. 3. Thus, the EEOC's investigation, once started, could have reasonably encompassed later events. Moreover, as plaintiff aptly points out, she specifically asked that her charge be amended and it was, in fact, amended to encompass allegations through March 2010, easily encompassing the time period WMATA claims is beyond the EEOC Charge. Accordingly, putting aside these superficial arguments, a closer look at plaintiff's submissions is required to determine whether a hostile work environment claim was properly exhausted.

18

As set forth above, plaintiff's EEOC Questionnaire included allegations concerning: clerical duties; MAXIMO training; administrative duties non-competitively assigned; being moved from Brentwood to Greenbelt; violation by a document; and, an inappropriate letter sent by her supervisor, Thompson, to the absenteeism department.  Pltf's Exh. B.  In plaintiff's EEOC Charge, she specifically alleges discrimination from December 7, 2006 to October 1, 2007, but also describes it as "continuing action."  Def's Exh. 3.  In that Charge, she also claims that she has "been subject to a *continuous pattern of discrimination*, *harassment* and retaliation."  *Id.* (emphasis added).  Furthermore, she specifically alleges *sexual harassment* based on her gender. *Id.*  She also alleges that she has been retaliated against with regard to assignments, *terms/conditions, and harassment*, based on filing an internal complaint of discrimination.  *Id.* (emphasis added).  After WMATA submitted to the EEOC a response to plaintiff's claims generally denying discrimination, plaintiff's counsel prepared a rebuttal in which he explicitly discusses: denial of MAXIMO training; non-selection for the five clerical positions; the alleged *constant harassment from her peers which includes tampered and stolen tools, the purposeful disorganizing of her workspace, and the receipt of an offensive note ("NEVER, EVER TOUCH MY DESK AGAIN!")*; and, the shock "prank."  Pltf's Exh.  D (emphasis added).

In her request that her EEOC charge be amended, plaintiff asserted retaliation in violation of Title VII and claims that the alleged *hostile treatment plaintiff received* in response to her requests to be moved to another *work environment*, culminating in her constructive discharge, was retaliation for her prior complaints of discrimination and retaliation.  Pltf's Exh. E.  The amended charge that resulted contained complaints of a *continuous pattern of discrimination, harassment, and retaliation,* and of being subjected to *sexual harassment based on her gender*. Pltf's Exh. F.  Moreover, the amended charge contains the allegation that she believed that she

had "been retaliated against for engaging in protected activity with regard to assignment, *terms/conditions, harassment*, reasonable accommodation, and constructive discharge in violation of Title VII." *Id.* (emphasis added).  Any investigation resulting from these communications which repeatedly refer to a number of allegedly discriminatory acts, "continuing action," a continuous pattern of discrimination and harassment, sexual harassment based on gender, retaliation with regard to assignments, terms/conditions, and harassment, constant harassment from peers, and hostile treatment in response to a request to change work environment culminating in constructive discharge, would reasonably encompass a hostile work environment claim.  *See Wade*, 780 F. Supp. 2d at 12 (charge alleging multiple acts of retaliatory conduct and alleging that the actions were continuous in nature would encompass a hostile work environment claim); *Klein v. Derwinski*, 869 F. Supp. 4, 10 (D.D.C. 1994) (charge alleging campaign of harassment and intimidation would encompass a hostile work environment).  Accordingly, the Court concludes that plaintiff exhausted a hostile work environment claim.

## 2.   What is the Scope of the Exhausted Hostile Work Environment Claim(s)?

Although plaintiff has exhausted a hostile work environment claim, the scope of such claim or claims is unclear.  WMATA has not really addressed this issue and plaintiff has lumped all of her subjectively unpleasant experiences at work into one overarching hostile work environment claim.   But, given the state of hostile work environment law, more analysis is necessary.

In order to properly assess plaintiff's hostile work environment claims, a few basic principles must be kept in mind.  First, the standards for judging a hostile work environment claim are sufficiently demanding to ensure that Title VII does not become a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82

(1998).  Thus, not everything that makes an employee unhappy would necessarily be part of a

hostile work environment claim.  Second, a "plaintiff 'must always prove that the conduct at

issue was not merely tinged with offensive . . . connotations, but actually constituted

discrimination . . . because of' the employee's protected status."  *Peters v. District of Columbia*,

873 F. Supp. 2d 158, 188-89 (D.D.C. 2012) quoting *Oncale*, 523 U.S. at 81.  "It is therefore

important in hostile work environment cases to exclude from consideration personnel decisions

that lack linkage of correlation to the claimed ground of discrimination."  *Id.*  Finally, in order

for allegations to qualify as "part of the same actionable hostile work environment claim," they

must be "adequately linked into a coherent hostile environment claim" by "involv[ing] the same

type of employment actions, occurr[ing] relatively frequently, and [being] perpetrated by the

same managers."  *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  With these

principles in mind, the Court examines the scope of plaintiff's hostile work environment claim.

Plaintiff has alleged discrimination based on her race (white), gender, and retaliation.  Although

it is not clear that plaintiff alleges a hostile work environment based on all of these attributes, in

an abundance of caution, the Court examines each of these in turn.

### i.   Hostile Work Environment Based on Race

Of the numerous allegations plaintiff has raised as part of her hostile work environment

claim, only two seem to have any correlation to her race.  Those claims involve the denial of

MAXIMO training and the denial of the assignment of administrative duties.  Thus, the scope of

such a claim would be quite narrow.  And, as set forth below, such a claim would suffer from a

possible lack of timeliness and a lack of severity and pervasiveness to alter the terms and

conditions of plaintiff's employment.

### ii.   Hostile Work Environment Based on Gender

The plaintiff's original and amended EEOC Charges frame the hostile work environment claim beginning in December 2006 and ending in March 2010 when plaintiff resigned.  As such, the Court will follow plaintiff's lead and constrain the analysis to that time period.  Thus, the beginning of the hostile work environment claim based on gender would include the alleged incident in which sexually offensive material was placed under plaintiff's toolbox, but exclude incidents predating it (*e.g.*, denial of MAXIMO training, electrical shock "prank," denial of railcar training).

The scope of the hostile work environment claim based on gender would also exclude claims that bear no correlation to plaintiff's gender.  Thus, incidents allegedly related to plaintiff's race (*e.g.*, MAXIMO training, administrative duties) are excluded.

And incidents related solely to plaintiff's retaliation claim would also be excluded. Working backwards in time, plaintiff's claims involving the denial of accommodations and requests to change work environment culminating in constructive discharge are, as framed by plaintiff, claims based on retaliation, not gender.  Pltf's Exhs. E & F.  Similarly, the incidents alleged to have occurred in 2009 (*e.g.,* contact with plaintiff's ex-husband, Dwayne Davis's critical comments at work meeting) have not in any way been tied to plaintiff's gender.  And the only claims raised that are specifically asserted to have occurred in 2008 (*e.g.,* given non-compliant schematics) do not appear at all related to plaintiff's gender.

Thus, based on the above principles, the scope of plaintiff's hostile work environment claim based on her gender would begin in December 2006 (sexually explicit materials under toolbox) and end at the conclusion of the exposure to sexually explicit materials at Greenbelt. Because the allegations concerning Greenbelt are imprecise, the record does not reflect an exact

end date for those allegations.  Consequently, the scope would also include alleged incidents

occurring between those two time periods (*e.g.*, Canales nasty note, psychiatric information

placed in file, move from Brentwood to Greenbelt).

### iii.   Hostile Work Environment Based on Retaliation

According to plaintiff's Amended EEOC Charge, the period of time encompassed by the

alleged hostile work environment claim is December 7, 2006 to March 6, 2010 (the approximate

date of plaintiff's resignation).  Because the record before the Court reflects that plaintiff first

engaged in protected activity on December 17, 2006, the Court slightly adjusts the alleged start

date to that date (*i.e.*, no materially adverse actions taken before that date could have been

*because of* having engaged in protected activity).

Accordingly, the scope of the alleged retaliatory hostile work environment claim would

include: psychiatric information placed in file; move from Brentwood to Greenbelt; letter sent by

Thompson to absenteeism department; damaged work bench/missing tools/rumors of being

troublemaker when complaints made about display of sexually explicit materials;[12] being

repeatedly given schematics that were not in compliance with engineering code; telephoning of

ex-husband and telling him plaintiff was AWOL; Chris Stallings's criticism in staff meeting;

and, being ordered to an IME and being refused transfer to another work environment, despite

---

[12]     Although some of these allegations were not raised in either the EEOC Questionnaire or
the EEOC Charge, but were disclosed only in interrogatory responses during the District Court
litigation, courts in this district have not required that every act supporting a hostile work
environment claim have been included in the EEOC documents.  *Hyson v. Architect of Capitol*,
802 F. Supp. 2d 84, 96 (D.D.C. 2011) (hostile work environment claim is not limited to those
specific allegations submitted administratively so long as some allegations were exhausted and
all of the allegations together form one hostile work environment claim); *Chandler v. Bernanke*,
531 F. Supp. 2d 193, 201 (D.D.C. 2008) (each incident making up retaliatory hostile work
environment claim does not require separate exhaustion because they are not discrete
employment actions but part of a series of acts that collectively constitute one unlawful
employment practice); *Green v. Small*, 2006 WL 148740, at *7 (D.D.C. 2006) (same).

WMATA's own internal recommendations that this occur, culminating in plaintiff's constructive discharge.

### 3.   Were These Hostile Work Environment Claims Timely Raised?

Given the scope of the various hostile work environment claims set forth above, the Court turns its attention to whether each of these claims were timely raised.  As the Supreme Court made clear in *Morgan*, the relevant statute provides that a charge must be filed within 180 days after the alleged unlawful employment practice occurred.  *Morgan*, 536 U.S. at 116-17.  But a hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." *Id.*  Thus, for purposes of determining timeliness under the statute, it does not matter that some of the component acts of the hostile work environment claim fall outside the statutory time period, so long as an act contributing to the claim occurs within the filing period; the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.  *Id.*

### i.   Hostile Work Environment Based on Race

As set forth above, any claim concerning a hostile work environment based on race would revolve around the denial of MAXIMO training and the denial of administrative duties.[13] Because plaintiff submitted her EEOC Questionnaire on June 24, 2007, and the Court has treated this as the appropriate "charge," in order for this hostile work environment claim to be timely, one of the alleged component acts must have occurred within 180 days of that submission (*i.e.*, after, on or about, December 24, 2006).  But the denial of MAXIMO training appears to have occurred in late 2005 or early 2006 (Pltf's Depo. at 44) and, with respect to the assignment of

---

[13]     Because there is no information in the record concerning the non-selection for clerical positions, it cannot be determined whether these claims too involve race discrimination.  But, regardless, as set forth above, there is no evidence that these claims would be timely.

administrative duties, there is no evidence that others were given such duties, or that such duties were available to be assigned to plaintiff, within six months of the charge.  Accordingly, it does not appear that a hostile work environment claim based on race was timely raised.

### ii.   Hostile Work Environment Based on Gender

By contrast, the hostile work environment claim based on gender appears to have been timely raised.  As set forth above, this claim would begin in December 2006 (sexually explicit materials under toolbox) and end at the conclusion of the exposure to sexually explicit materials at Greenbelt.  Within 180 days of submitting her EEOC Questionnaire, plaintiff alleged that she was discriminatorily moved from Brentwood to Greenbelt (June 2007).

### iii.   Hostile Work Environment Based on Retaliation

In her counsel's letter requesting amendment of the charge, plaintiff alleges that she was subjected to a retaliatory hostile work environment that culminated in her constructive discharge in March 2010.  Pltf's Exh. E.  Because in this letter of July 21, 2010 plaintiff requests that the EEOC activate its machinery and remedial processes, the Court also treats this letter as a charge. *Federal Express Corp. v. Holowecki*, 552 at 402-03.  Because the alleged constructive discharge (*i.e.*, one of the claims' component parts) took place in March 2010 -- within 180 days of the charge -- this hostile work environment claim too was timely brought.

### 4.   Are the Claims Sufficiently Severe or Pervasive?

The plaintiff has raised a hostile work environment claim based on the allegation that WMATA created or condoned a discriminatorily hostile or abusive environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65 (1986).  Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

25

working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and quotation marks omitted). The Supreme Court in *Harris* explained that assessing whether a hostile work environment exists has both subjective and objective components. WMATA has not challenged plaintiff's subjective belief that she was subjected to a hostile work environment.

The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale*, 523 U.S. at 81 (internal quotations and citations omitted). This objective test requires examination of the totality of the circumstances, including "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

But, as previously stated, the Supreme Court has been clear that Title VII does not establish a "general civility code for the American workplace." *Oncale*, 523 U.S. at 80. Indeed, "Title VII does not prohibit all verbal or physical harassment in the workplace." *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted). Thus, to "[prevent] Title VII from expanding into a general civility code," the Supreme Court has emphasized as "crucial" the requirement that the behavior be "so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81; *see also Faragher*, 524 U.S. at 788 ("Conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."). Consequently, in order to assess the viability of plaintiff's hostile work environment claim, the Court must determine whether each of her hostile work environment claims allege acts that, taken as a whole, are

sufficiently severe or pervasive to have altered the conditions of plaintiff's employment and created an abusive working environment.

### i.   Hostile Work Environment Based on Race

As set forth above, plaintiff's claims concerning a hostile work environment based on race revolve around the denial of MAXIMO training and the denial of administrative duties. Because these allegations are not sufficiently severe or pervasive to constitute a hostile work environment, this claim must fail.

Plaintiff claims that she was denied MAXIMO training.  Although she claims in conclusory fashion that such training would have been career enhancing, there is some basis in the record to conclude that such training would have prepared her for a lower-paying job.  Def's Exh. 5, Grievance Opinion, at 4.  At most, such training would have prepared her for a lateral position similar to her colleagues who had been assigned administrative duties but remained in the same position.  Moreover, there is also some evidence that, although plaintiff did not receive the extent of MAXIMO training she desired, she did, in fact, receive some MAXIMO training and was given a training manual she could use to learn the program on her own time.  Whorton Depo. at 42-44.  With respect to the non-selections, there is little information in the record upon which to draw many inferences.  But, again, with respect to purely clerical positions or the assignment of administrative duties within the same job, it does not appear that these sought-after positions involved true promotions.  Accordingly, under these circumstances, a possible handful of non-selections for lateral or lower-paying positions and the denial of further training on a program that would not necessarily enhance the plaintiff's chance at promotion does not result in sufficiently severe or pervasive discriminatory intimidation, ridicule, and insult to amount to an actionable hostile work environment claim based on race.  *See, e.g., Allen v.*

*Napolitano*, 774 F. Supp. 2d 186, 204-06 (D.D.C. 2011) (plaintiff's claims of a hostile work environment including denial of up to seven training opportunities and a non-selection for a position amount to nothing more than typical employment grievances and ordinary workplace conflict and are insufficiently severe or pervasive to support a hostile work environment claim); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 126-28, 135-36 (D.D.C. 2010) (plaintiff's claims of a hostile work environment including denial of requests for transfers or details to other positions and denial of four training courses not sufficiently severe or pervasive to be actionable); *Pearsall v. Holder*, 610 F. Supp. 2d 87, 98-99 & n.10 (D.D.C. 2009) (same involving claims that included denial of training); *Singleton v. Potter*, 402 F. Supp. 2d 12, 42 (D.D.C. 2005) (same involving claims that included non-selection to two positions).

### ii.   Hostile Work Environment Based on Gender

The plaintiff's hostile work environment claims based on gender are more easily dealt with.   These claims involve allegations that sexually offensive material was left under plaintiff's toolbox and that co-workers regularly displayed sexually explicit materials on their workbenches in her line of sight.   A reasonable juror could conclude that these alleged acts (in addition to the others) are sufficiently severe or pervasive to amount to an actionable hostile work environment. *See, e.g., Hoyle v. Freightliner*, 650 F.3d 321, 326-27, 333-34 (4th Cir. 2011) (the evidence marshaled by the plaintiff, that she was exposed to work environment containing photos of scantily-clad woman on toolbox, sexually provocative calendars, and nude picture of woman as computer screen-saver, was sufficient to generate a genuine dispute of material fact as to whether the abusive aspects of her work environment were severe or pervasive).

### iii.   Hostile Work Environment Based on Retaliation

Plaintiff's allegations of a hostile work environment based on retaliation cover a longer

period of time.   This claim includes allegations that, after plaintiff engaged in protected activity: her psychiatric information was placed in a file; she was involuntarily moved from Brentwood to Greenbelt; her supervisor sent an unfavorable letter to the absenteeism department; when she complained of being subjected to sexually explicit materials in the workplace, her work bench was damaged, her tools went missing, and it was rumored she was a trouble-maker; she was repeatedly given schematics that were not in compliance with engineering code; her supervisor telephoned her ex-husband and told him she was AWOL; a supervisor openly criticized her in a staff meeting; and, after being ordered to an IME and being refused transfer to another work environment despite WMATA's own internal recommendations that this occur, she was constructively discharged.

WMATA argues in its Supplemental Brief that plaintiff has failed to raise allegations of sufficiently severe or pervasive actions to amount to an actionable hostile work environment claim. [Docket No. 23 at 2-3].   But WMATA does not support this argument with analysis.   That alone would be reason to deny its motion.

WMATA has suggested that plaintiff was not subjected to a constructive discharge because her resignation was voluntary.   But there is nothing on the face of the resignation letter nor in the surrounding circumstances[14] that demonstrate that, as a matter of law, the resignation was voluntary.   Plaintiff has continuously claimed that she was constructively discharged since her first post-resignation contact with the EEOC.   Pltf's Exh. E.   A one page, handwritten resignation letter indicating that plaintiff's resignation was based, in part, on her desire to improve her health, could equally support a claim of constructive discharge.   Def's Exh. 6.   And,

---

[14]    For instance, WMATA does not assert that plaintiff left WMATA for a higher-paying job elsewhere.

as set forth above, some of WMATA's own employees thought that plaintiff should not be forced to return to her previous work environment.  Suffice it to say that, WMATA forcing plaintiff to return to that work environment against the advice of its Medical Services and Compliance Branch, along with all of the other alleged acts set forth above, when considered in the aggregate in the light most favorable to plaintiff, could lead a reasonable jury to conclude that the alleged offensive conduct was sufficiently severe or pervasive such that it altered the terms and conditions of plaintiff's employment and created an abusive work environment.  *See generally, Harris*, 510 U.S. at 21.

## IV.   CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The plaintiff's hostile work environment claims based on her gender and retaliation covering the time periods set forth above survive for trial.  All other claims are dismissed.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 21st day of February, 2013.

RUDOLPH CONTRERAS
United States District Judge